## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| ANGELA D. PERRY, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **Case No.: 3:13-cv-02252-P-BH** |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| **Defendant.** | § | |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order No. 3-251*, this social security appeal was automatically referred for findings of fact and recommendation for disposition. Before the court are *Plaintiff's Motion for Summary Judgment,* filed October 3, 2013 (doc.11), and *Defendant's Response Brief,* filed November 4, 2013 (doc. 13). Based on the relevant filings, evidence, and applicable law, the plaintiff's motion should be **DENIED**, and the final decision of the Commissioner should be wholly **AFFIRMED**.

## I.  BACKGROUND

### A.    Procedural History

Angela Perry (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act. (*See* doc. 8.) Plaintiff applied for DIB on April 29, 2010, alleging disability due to Arnold-Chiari malformation, occipital neurologlia, and neck pain, allegedly beginning on April 22, 2010. (R. at 84-100.) Her application was denied initially and upon reconsideration. (R. at 15, 98-100.) She personally appeared and testified at a hearing

before an Administrative Law Judge (ALJ) held on January 11, 2012. (R. at 15, 38 -83,113.) On

May 24, 2012, the ALJ issued his decision finding that Plaintiff was not disabled. (R. 12-32.)

The Appeals Council denied her request for review on April 16, 2013, making the ALJ's

decision the final decision of the Commissioner. (R. at 1-6.) She timely appealed the

Commissioner's decision pursuant to 42 U.S.C §405(g). (*See* doc.1)

**B.**   **Factual History**

*1.*   *Age, Education, and Work Experience*

Plaintiff was born on September 27, 1969, and was 42 years old at the time of the hearing

before the ALJ. (R. at 41.) She has a GED and past relevant work experience as a material

handler, retail customer service representative, shipping clerk, front desk clerk, and waitress. (R.

at 41, 44-45.)

*2.*   *Medical Evidence*

Plaintiff has an extensive medical history. In 2005 she was diagnosed with Arnold-Chiari

malformation. She underwent a suboccipital craniatomy and was treated with cervical facet

injections, trigger points, occipital nerve blocks, and Botox injections. (R. at 297, 436.) In April

of 2009, she had a neurostimulator implanted. (R. at 434.) For about a year she had "on-going

relief," was "doing well," and "was headache free." (R. at 279-290.)

On April 23, 2010, Plaintiff visited Dr. Sardar, a pain management specialist, to discuss

"adequate pain control." (R. at 256.) She rated her pain a 3/10. (*Id.*) Dr. Sardar found that she

was in "no acute distress," had no significant tenderness to palpation over the cervical paraspinal

muscles and the base of the occiput, had 5/5 motor strength, and had sensation intact to light

touch. (R. at 257.) Plaintiff complained that Hydrocodone was not lasting eight hours, and Dr.

Sardar increased her dosage. (*Id.*)

On April 28, 2010, Plaintiff presented to Dr. McClaran. (R. at 242.) She complained of increasing neck pain that had been occurring persistently for three weeks. (*Id.*) The pain was moderate, but exacerbated by rotating her head or neck or by looking up or down. (*Id.*) The physical examination showed that Plaintiff was "comfortable," in "no distress," and had a normal head and neck. (*Id.*) There was, however, some tenderness in her neck muscles. (*Id.*) Dr. McClaran's diagnoses were muscle spasm and cervicalgia, and he prescribed Carisoprodol and Naprosyn. (*Id.*)

On May 12, 2010, Plaintiff returned to Dr. McClaran for neck pain and "severe" stiffness. (R. at 239.) She told him that despite her attempts to "push through" the pain, she could "no longer function at work" because the pain was so "severe". (R. at 240.) The physical examination revealed that Plaintiff was "comfortable," in "no distress," had a normal head and neck, and some tenderness in her neck muscles. (*Id.*) She was diagnosed with cervical neck syndrome, chronic pain syndrome, spina bifida with hydrocephalus, and cervicalgia. (*Id.*)

Plaintiff saw Dr. McClaran again on June 2, 2010. (R. at 236.) She complained of severe neck stiffness and facial swelling, but did not complain of musculoskeletal or neurological issues. (R. at 236-37.) The physical examination showed that Plaintiff was "comfortable" and in "no distress." (R. at 237.) The musculoskeletal examination showed she had a normal range of motion, no edema, and non-tender extremities. (*Id.*) However, the head and neck inspection revealed a decreased range of motion, tenderness, and nucchal rigidity. (*Id.*) She was diagnosed with symptoms of menigismus. and was directed to the Medical Center of Arlington Emergency Department. (R. at 237, 380.)  There, Stephen Lummus, P.A.,. evaluated her, instructed her to

take Tylenol or Motrin for fever control, and prescribed Flexeril for muscle spasm. (R. at 380.)

Two days later, Plaintiff presented to Dr. Sardar with worsening neck pain, limited range of motion, neck and shoulder spasms, and neck stiffness, for which she underwent a lumbar puncture. (R. at 273.) Her stimulator was "working ok," and she was "not having as many headaches." (R. at 275.) She rated her pain a 7/10. (R. at 274.) Dr. Sardar found Plaintiff was in "no acute distress," had no tenderness over the facet joints or spinous processes, had 5/5 motor strength, and had sensation intact to light touch. (R. at 274.) He did, however, note a tenderness to palpation over the cervical facet joints and the base of her occiput. (*Id.*) He prescribed Hydrocodone, Soma, Naxproxen, and Medrol dosepak. (R. at 275.) A CT of the head and cervical spine and an x-ray of the cervical spine was completed on June 10, 2010. (R. at 275, 693.) The CT of the head was unremarkable, and the c-spine x-ray did not show any significant abnormalities. (R. at 693.)

On June 16, 2010, Plaintiff told Dr. McClaran she was experiencing severe neck stiffness and neurological pain, including numbness in her upper extremities, dysethesia, and tremor. (R. at 234.) Although Plaintiff said she could "no longer function at work," her physical examination indicated that she was "comfortable," "in no distress," and had a normal head and neck, full range of motion, and no musculoskeletal abnormalities. (R. at 233-34.) There was, however, some tenderness in her neck muscles. (R. at 234.)

Plaintiff visited Dr. McClaran on July 12, 2010, with complaints of anxiety, excessive worry, fatigue, insomnia, irritability, numbness, trouble walking, dizziness, spinning sensation, tremor, unusual sensation (poor fine motor skills and dexterity), and headaches that were moderate in severity and sharp in quality. (R. at 230.) The physical examination once again

revealed that Plaintiff was "comfortable," in "no distress," had a normal head and neck, had a normal range of motion, and no musculoskeletal abnormalities. (R. at 231.) There was some tenderness in Plaintiff's neck muscles. (*Id.*) Plaintiff was diagnosed with anxiety disorder NOS, chronic pain syndrome, spina bifida with hyrocephalus, and cervical neck syndrome, and Dr. McClaran prescribed anxiety medication. (*Id.*)

Plaintiff visited Dr. Nieto on August 19, 2010. She complained that she was experiencing headaches, neck pain, clumsiness, lack of coordination of her right arm, and difficulty moving the fingers in her right hand at will. (R. at 315, 318.) Plaintiff's coordination overall was normal. Her fine finger movements and rapid alternating movements were normal bilaterally.  Dr. Nieto did note that Plaintiff's finger to nose was slow with the left hand, however.  (R. at 356.) He also reported that Plaintiff had normal concentration. (R. at 355-356.)

On August 24, 2010, Plaintiff returned to Dr. Sardar with complaints of baseline headaches, tremor, and flashing white lights. (R. at 250.) Dr. Sardar reported that Plaintiff was in "no acute distress." (R. at 251.) He referenced the CTs from June 10, 2010, noting that there was no evidence of acute intracranial hemorrhage or intracranial pathology, and there were no findings of an acute fracture or dislocation. (*Id.*) He did mention a showing of patent central canal and neural foramen and tenderness to palpation over the cervical facet joints. (*Id.*)

Plaintiff presented to Dr. McClaran on February 7, 2011. (R. at 683.) She complained of a headache in the right frontal area, a sore throat, and acute sinusitis. (*Id.*) Dr. McClaran's physical examination showed that Plaintiff was "comfortable," in "no distress," and had a normal head and neck. (R. at 684.)  She had facial puffiness and nasal congestion. (*Id.*) She was diagnosed with sinusitis and prescribed antibiotics. (R. at 685.)

The next day, Plaintiff told Dr. Sardar she was experiencing low back pain, fever, sore throat, and sinus pressure. (R. at 735.) Although Plaintiff described the pain as "severe," the physical examination revealed that she was in "no apparent distress," had normal gait, normal heel/toe tandem walking, and 5/5 manual muscle strength. (R. at 736-38.) Additionally, the results of her psychiatric examination, including for concentration, were entirely normal. (R. at 737.) Dr. Sardar again noted the results from the CTs. (R. at 738.) He instructed her to follow up with her primary care physician for a strep test and prescribed Hydrocodone and Soma. (*Id.*)

On March 23, 2011, Plaintiff returned to Dr. McClaran with complaints of head pain, neck pain, back pain, stiffness, and decreased range of motion. (R. at 686.) The physical examination showed that Plaintiff appeared "comfortable," and in "no distress." (R. at 687.) Dr. McClaran did find that Plaintiff had abnormal head and neck movements, dysdiadokinesia, and increased problems with fine motor skills. (*Id.*)

On April 26, 2011, Plaintiff informed Dr. McClaran that "she feels well" with "some minor complaints. " (R. at 689.) She complained of muscle spasms in her shoulder. (*Id.*) The physical examination revealed that Plaintiff was "comfortable," "in no apparent distress," and had a normal neck. (R. at 690-691.) The same day, Plaintiff complained to Dr. Sardar of back pain. (R. at 693.) Even though Plaintiff rated her pain a 6-7/10, her physical examination showed a 5/5 manual muscle strength in all extremities and a normal neck. (R. at 693, 695.) There was, however, some decreased range of motion in her spine. (R. at 695.) Dr. Sardar reiterated that the CT scan was unremarkable, and that a c-spine x-ray did not show any significant abnormalities. (R. at 696.) He diagnosed her with muscle spasm, cervical radiculopathy, cervical spinal stenosis, cervical degenerative disc disease, cervical spondylosis without myleopathy, facial

pain, chronic pain syndrome, and AC maxillary sinusitus. (*Id.*) He prescribed morphine IR and Soma. (*Id.*)

On September 1, 2011, Plaintiff told Dr. Sardar that she was experiencing neck pain and headaches. (R. at 756.) She rated her pain 6-7/10. (*Id.*) Her physical examination showed that she was in "no apparent distress," and had 5/5 manual muscle strength. (R. at 758-759.) There was some tenderness, and a decreased range of motion in the neck/upper back area. (*Id.*) Her psychiatric exam, including concentration, was entirely normal. (R. at 759.) She did not tolerate morphine well and was restarted on Hydrocodone. (R. at 759.) Dr. Sardar also noted that despite his instructions, Plaintiff did not follow up with Dr. Nieto for an EEG. (*Id.*)

On February 29, 2012, Plaintiff presented to Dr. Sardar with complaints of heaviness in her neck. (R. at 781.) She stated that her headaches had not changed since the CT scans in 2010. (*Id.*) Dr. Sardar noted that the c-spine x-ray did not show any abnormalities. (*Id.*) A urine drug screen was conducted. (R. at 786.) Although she tested positive for Hydrocodone, she did not test positive for Clonazepam, Soma, and Temazepam as anticipated. (*Id.*)

**C.    Residual Functional Capacity (RFC) Findings**

*1.    Physician Reports*

On May 12, 2010, Dr. McClaran restricted Plaintiff from engaging in work involving lifting or reaching overhead, prolonged standing, carrying heavy objects, pulling, pushing, and using power equipment. (R. at 399.) He opined that Plaintiff could never return to work because her "permanent functional limitations" and "sedating medications could endanger herself or a coworker." (*Id.*) He cited Plaintiff's Arnold-Chiari malformation, status post surgical decompression of hydrocephalus with occipital neuralgia, chronic and severe headaches, nausea,

vomiting, and neck stiffness as factors preventing her return to work. (*Id.*)

On June 16, 2010, Dr. McClaran determined that Plaintiff could occasionally perform the following activities: sitting, standing, walking, reach in all directions, lifting/carrying up to ten pounds, pushing, pulling, climbing, kneeling, crouching, crawling, and using lower extremities for foot controls. (R. 384-85.)

On September 2, 2010, Dr. Nieto placed the following restrictions on the type of work Plaintiff could engage in: no lifting greater than ten pounds, stooping, reaching, pushing, pulling, and balancing. (R. at 315.) He opined that she could never return to work, and that the spasms, pain, and decreased neck motion, contributed to her exacerbated headaches. (*Id.*) He also completed a Physical Ability Assessment, and reported that Plaintiff could constantly perform the following activities: sit, stand, reach at desk level, see, hear, and use her lower extremities for the operation of foot controls. (R. at 316-17.) She could also constantly engage in fine manipulation, simple grasp, and firm grasp with her left hand. (R. at 316.) He determined that Plaintiff could occasionally perform the following activities: walk, lift/carry up to 10 pounds and climb stairs. (R. at 317.)

On the same day, Dr. McClaran completed a Physical Ability Assessment. (R. at 361-62.) He determined that Plaintiff could constantly perform the following activities: sit, lift/carry up to ten pounds, see, and hear. (*Id.*) He also opined that Plaintiff could frequently perform the following activities: stand, lift/carry up to twenty pounds, fine manipulation of both hands, simple grasp of both hands, firm grasp of both hands, and using lower extremities for foot controls. (*Id.*) She could occasionally perform the following activities: walk, reach overhead, reach at desk level, and reach below the waist. (*Id.*)

8

On September 17, 2010, Dr. McClaran completed a Multiple Impairment Questionnaire. (R. at 323-330.) He diagnosed Plaintiff's with Arnold-Chiari malformation, which caused chronic severe occipital neuralgia with nausea and vomiting, neck stiffness and neck pain. (R. at 323.) He estimated a pain level of nine (severe), that she could sit for three hours, could stand/walk for two hours, could frequently lift/carry up to ten pounds, could occasionally lift/carry up to twenty pounds, had a marked limitation using arms for overhead reaching, and had a moderate limitation in grasping, turning, twisting objects, and using fingers/hands for fine manipulation. (R. at 325-27.) Dr. McClaran also reported that Plaintiff's pain, fatigue, and other symptoms were severe enough to "constantly" interfere with her attention and concentration. (R. at 328.)

On March 23, 2011, Dr. McClaran completed another Physical Ability Assessment. He opined that Plaintiff could constantly perform the following activities: sit, carry up to ten pounds, see, and hear. (R. at 709-10.) He also stated that Plaintiff could frequently perform the following activities: lift up to ten pounds, carry up to twenty pounds, use lower extremities for foot controls, fine manipulation, simple grasp, and firm grasp. (*Id.*) He determined that Plaintiff could occasionally perform the following activities: stand, walk, reach in all directions, lift up to twenty pounds, push, pull, climb regular stairs, balance, stoop, kneel, and crouch. (*Id.*) He noted that she frequently dropped objects. (R. at 709.)

On January 5, 2012, Dr. McClaran completed another Multiple Impairment Questionnaire. (R. at 776-773.) He estimated a pain level of nine (severe), that she could sit for three hours, stand/ walk for two hours, frequently lift/carry up to ten pounds, occasionally lift/carry up to twenty pounds, and had moderate limitations using fingers/hands for fine

manipulations. (R. at 768-70.) Dr. McClaran also reported that Plaintiff's pain, fatigue, and other symptoms were severe enough to "constantly" interfere with her attention and concentration. (R. at 771.)

### 2. State Medical Agency Consultant (SAMC) Reports

On April 2, 2011, Yvonne Post, D.O., SAMC, examined all evidence on file and determined that Plaintiff could occasionally lift and/or carry up to twenty pounds, frequently lift or carry up to ten pounds, stand and/or walk with normal breaks for a total of six hours, and sit for about six hours. (R. at 660.) The SAMC determined that Plaintiff could push and/or pull and that she did not have postural, manipulative, or communicative limitations. (R. at 663.)  She found that the allegations were partially supported by evidence in the record. (R. at 666.) The SAMC's assessment was later reviewed along with new evidence and affirmed by another SAMC, Kavitha Reddy, M.D. (R. at 739.)

## D.   Hearing Testimony

On January 11, 2012, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 38-83.) Plaintiff was represented by an attorney. (R. at 38-83.)

### 1. Plaintiff's Testimony

Plaintiff testified that she was 42 years old, married, and living with her husband and her son in a rental mobile home about 10 miles from Waxahachie. (R. at 52-54.) She was right-handed and five feet five inches tall. (R. at 49.) She could not clearly recall the last time she was weighed by her doctor or by herself, and estimated that she weighed 215 pounds. (R. at 49-51.)

She had received her GED and enrolled in CTU Online[1], but withdrew before receiving any

---

[1]Colorado Technical University (R. at 450.)

credit hours. (R. at 41.) She had not completed vocational courses and training for a particular job. (R. at 42.) For the past thirteen years, Plaintiff worked as a material handler and customer service representative. Prior to that, she had worked as a front desk clerk for two years. She also worked as a waitress at a pool hall for about a month. (R. 44-46.)

In response to the ALJ's question, Plaintiff testified that her last day of work was April 22, 2010. (R. at 43.) She stopped working because of the fast pace and strenuous walking, bending, lifting, and carrying. (R. at 63.) She experienced daily headaches that were worsened by bending over and picking up things. (R. at 67-68.) When Plaintiff bent over, she felt as though her brain had shifted to the front of her head. (*Id.*) When she stood up, she saw spots and felt as though her brain had shifted back. (R. at 68.) The work made her physically sick; she would get hot, nauseous, start sweating, and have to lie down. (R. at 64.) She was unable to look from side to side or left all the way, and her neck felt "beaten" if she was not propped up. (R. at 69,70.) She was constantly dropping items such as a gallon of milk, V8 juice, and laundry detergent, because of the shaking, nerve trauma, and headache. (R. at 65, 69, 70.) When Plaintiff would grab something, she would just feel weak and would have to consciously remember to hang on to the item. (R. at 69.)

Plaintiff received Short-Term Disability for approximately 26 weeks, after which she received Long-Term Disability in the amount of $1,400 a month. (R. at 43.) She was not required to file for Social Security through her Long Term Disability. (R. at 46.) Although she had a 401k with her employer, she could not access it unless she was awarded benefits from the state. (*Id.*) Plaintiff was unsure if she could continue on Long-Term Disability forever, but she was aware that she would have to pay back the difference between her Social Security and Long-Term Disability. (R. at 47.)

Plaintiff testified as to her extensive medical history. (R. at 44.) She was diagnosed with Arnold-Chiari malformation in 2005.[2] *(Id.)* She received nerve block injections from 2007 through 2009. (R. at 74.) In 2009, she had a neurostimulator implanted. (R. at 48, 66.) She had previously struggled with her weight. (R. at 51-52.) She did not regularly exercise, had never participated in a weight loss program, and had not undergone LAP-BAND or gastric bypass. (*Id.*) She had, however, been prescribed Adipex for a weight problem. (R. at 51.)

From January of 2010 through January of 2012, Plaintiff had not been hospitalized or had any surgeries or operations. (R. at 48.) She was experiencing neck spasms, facial swelling, problems with the back of her head, shoulder pain, difficulty in holding her head upright, and problems with the top of her spine. (R. at 71.) Plaintiff was also evaluated by a chiropractic neurologist. (R. at 48.) She did stretches, but had not engaged in physical therapy or rehabilitation. (R. at 47-48.) The doctors told her they had done everything they could do for her condition.

On a typical day, Plaintiff would lie down on the bed or the couch and watch TV all day. She was able to engage in a variety of activities; she read books, used the computer for email, shopped for groceries, cooked, did laundry, baked, and helped with the dogs. (R. at 55-56, 58-60.) Plaintiff was also able to clean. (R. at 60.) She managed the normal upkeep of her house, including picking up after herself and her family, and had no difficulty standing for fifteen to twenty minutes to do dishes. (R. at 60, 75.) She had a Texas driver's license and was able to drive. (R. at 55.) Because she had to watch her range of motion when driving, she would either use her mirrors or have her son accompany her. (R. at 75-76.)

---

[2]Plaintiff testified that she had filed a previous application for Social Security in 2005 for her Arnold-Chiari malformation. (R. at 44.) She alleged that her current application is different from her former application because the headaches are more severe. (R. at 43.)

12

Her health problems limited her daily life. Plaintiff could not wash her hair everyday or wear her hair in a ponytail, and she had to sleep on her back or her side. (R. at 72.) She took the highest dose of pain medication, and even though it did not make her feel totally "loopy," she would not feel like doing anything. (R. at 73.)  If she tried to do something after taking the medication, the activity would bother her head or her spine, and then she would lie down.(R. at 73-74.)

### 2.    VE's Testimony

Talesia Beasley, a vocational expert (VE), also testified at the hearing. (R. at 78-83.) She classified Plaintiff's past relevant work as a shipping clerk (light, skill level 2), a material handler (heavy, skill level 3), a retail customer service representative (light, skill level 4), and a waitress (light, skill level 3). (R. at 78-79.) She stated that there were transferable skills. (R. at 79.)

The ALJ asked the VE whether a hypothetical person with Plaintiff's age, education, and work experience could perform work existing in significant numbers in the national economy if she had the following limitations: perform light work, stand and/or walk for about two hours in a workday, sit up to six; no push/pull limitations but should not do more than occasional bending; and should avoid even moderate exposure to hazards such as unprotected heights and dangerous moving machinery. (R. at 79.) The VE opined that although the hypothetical individual could not perform any of Plaintiff's relevant past work, the hypothetical person could perform the job of order control clerk (sedentary, 3), with 6,662 jobs in Texas and 103,090 in the national economy; inventory clerk (sedentary, 4), with 8,680 jobs in Texas and 294,989 in the national economy; and food checker (sedentary, 3), with 6,654 in jobs in Texas and 66,469 in the national economy. (R. at 80.)

Counsel modified the hypothetical to an individual who was limited to lifting up to ten pounds frequently, twenty pounds occasionally; sitting for six hours; standing and walking for two

hours out of an eight-hour workday; but no bending. (R. at 80.)The VE opined that this would not affect the hypothetical individual's ability to complete the listed jobs because they are sedentary and would primarily involve sitting. (*Id.*) Although the individual might have to lean forward, he/she would not be actually bending. (*Id.*)   Counsel further modified the hypothetical to include an individual limited to occasional handling and negligible reaching, and the VE testified that this hypothetical individual could not do these jobs because the reaching, handling and fingering is frequent. (R. at 81. ) The VE also opined that an individual limited to sitting for three hours out of an eight-hour workday and standing and walking for two hours out of an eight-hour workday would not be able to complete the listed jobs. (*Id.*)  The listed jobs require that an individual be able to sit for six hours or stand for six hours. One could alternate between the two, but must be able to do at least one function for up to six hours. (*Id.*)

E.    **ALJ's Findings**

The ALJ issued his decision denying benefits on May 24, 2012. (R. at 32.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of April 22, 2010. (R. at 17.) At step two, the ALJ determined that the Plaintiff had six severe impairments: headaches; hypertension; history of Arnold Chiari malformation; cervical radiculopathy; cervical spinal stenosis; and chronic pain syndrome. (R. at 17.) The ALJ next determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 [20 CFR 404.1520(d), 404.1525 and 404.1526]. The ALJ determined that the Plaintiff retained the RFC to lift and carry 10 pounds frequently and 20 pounds occasionally; stand/walk for two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; not limited

in pushing or pulling (including the operation of foot and/or hand controls) with upper and lower extremities; can occasionally bend; and should avoid even moderate exposure to hazards, such as unprotected heights or dangerous machinery. At step four, the ALJ determined that Plaintiff was unable to perform any of her past relevant work. (R. at 29.) At step five, with the testimony of the VE, the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform, such as order control clerk (sedentary, 3), with 6,662 jobs in Texas and 103,090 in the national economy; inventory clerk (sedentary, 4), with 8,680 jobs in Texas and 294,989 in the national economy; and food checker (sedentary, 3), with 6,654 in jobs in Texas and 66,469 in the national economy. (R. at 80.)

## II. ANALYSIS

### A.   Legal Standards

#### 1.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legals standards in evaluating evidence. *Greenspan v. Shalala*, 38 F.3d 232,236 (5th Cir. 1994); 42 U.S.C.§405(g),1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable midn might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558,564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decisions. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of

credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432,435 (5th Cir.1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Therefore, the Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id.*

### 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-564; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be

16

disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F. 2d 123,125 (5th Cir. 1991)(per curiam)(summarizing 20 C.F.R.§404.1520(b)-(f))(20 C.F.R. §404.1520(a)(4)(i)-(v)(2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55,58 (5th Cir. 1987).

**B.** **Issues for Review**

Plaintiff presents two issues for review:

(1) Whether the ALJ failed to follow the treating physician rule; and

(2) Whether the ALJ failed to properly evaluate Plaintiff's credibility.

(Pl. Br. at 5.)

## C.      Treating Physician Rule

Plaintiff argues that the ALJ improperly rejected the opinions of her treating physician, Dr. McClaran, and failed to consider each of the factors set forth in 20 C.F.R. § 404.1527(c) and § 416.927(c) (Pl.Br. at 15.)

The Commissioner is entrusted to make determinations regarding disability, including weighing evidence. 20 C.F.R.§ §404.1520b(b) and 404.1527(c)(2012). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. §404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence," the Commissioner must give such an opinion controlling weight. 20 C.F.R.§404.1527(c)(2); *Newton*, 209 F.3d at 455. If controlling weight is not given to a treating source's opinion, the Commissioner applies six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a

18

specialist or non-specialist; and (6)any other factor which "tend[s] to support or contradict the opinion. *See id.* §404.1527(c)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. If the evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455-46. Ordinarily, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. §404.1527(d)(2)." *Id.* at 453 (emphasis in original). A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, in the narrative discussion of Plaintiff's RFC, the ALJ considered the reports from Plaintiff's visits with Dr. McClaran and the forms he filled out, including the Physical Ability Assessment from June 16, 2010, the Physical Ability Assessment from September 2, 2010, the Multiple Impairment Questionnaire from September 17, 2010, the Physical Ability Assessment

from March 23, 2011, and the Multiple Impairment Questionnaire from January 5, 2012.  Tthe ALJ found that Plaintiff had the RFC to perform light work, such as lifting/carrying twenty pounds occasionally and ten pounds frequently; standing/walking for two hours in an eight-hour workday; sitting for about six hours in an eight-hour work day.  He also determined that Plaintiff was not limited in pushing or pulling (including the operation of foot and/or hand controls) with upper and lower extremities, could occasionally bend, and should avoid even moderate exposure to hazards, such as unprotected heights or dangerous machinery. In reaching this conclusion, the ALJ rejected Dr. McClaran's findings that Plaintiff could only sit for three hours in an eight-hour workday and had limitations in her hand controls, i.e., moderate limitations in grasping, turning, and twisting, and significant limitations in repetitive reaching, handling, and fingering.

Dr. McClaran's opinions were inconsistent with his own findings. In the September 17, 2010 Multiple Impairment Questionnaire, and the January 5, 2012 Multiple Impairment Questionnaire, Dr. McClaran estimated that Plaintiff could sit for three hours. (R. at 325, 768.) In the Physical Ability Assessments from September 2, and March 23, 2011, Dr. McClaran estimated that Plaintiff could sit "constantly," or at least for 5.5 hours. (R. at 361, 709.)

Dr. McClaran's opinions were also inconsistent with the findings of two other examining physicians.  On September 2, 2010, both Dr. McClaran and Dr. Nieto completed Physical Ability Assessments. (R. at 315-17, 671-73.) Dr. Nieto found that Plaintiff could constantly sit, stand, and reach at desk level.  Although Dr. McClaran also found that Plaintiff could constantly sit, he found that Plaintiff could frequently stand, and could only occasionally reach at desk level.  (R. at 671-73.) With regard to Plaintiff's lifting and carrying abilities, Dr. Nieto found that she could only occasionally lift/carry up to ten pounds. (R. at 315-17, 671-73.)  However, Dr. McClaran

20

reported that Plaintiff could constantly lift/carry up to ten pounds.  Their findings regarding

Plaintiff's mental status were also inconsistent.  (R at 355, 323, 776.)  Dr. Nieto found that

Plaintiff exhibited a normal memory and normal attention span/concentration. (R. at 355.)

However, in the Multiple Impairment Questionnaire from September 17, 2010, and the Multiple

Impairment Questionnaire from January 5, 2012, Dr. McClaran reported that Plaintiff's pain,

fatigue, and other symptoms were severe enough to "constantly" interfere with her attention and

concentration. (R. at 328.)

      Dr McClaran's findings were also inconsistent with Dr. Sardar's findings. (R. at 769,

257, 275, 737.)  In the Multiple Impairment Questionnaire from January 5, 2012, Dr. McClaran

reported that Plaintiff had problems with her motor skills, specifically citing an "increased

incidence of dropping dishes" and "difficulty writing" as indicative of decreasing fine motor

skills. (R. at 769.)  However, on April 23, 2010, June 4, 2010, August 24, 2010, February 8,

2011, April 26, 2011, September 1, 2011, February 29, 2010, Dr. Sardar reported that Plaintiff

had 5/5 motor skills. (R. at 257, 274, 251, 737, 695, 758, 783.)  Dr. McClaran and Dr. Sardar's

findings also conflicted in regards to Plaintiff's ability to concentrate and pay attention. In the

Multiple Impairment Questionnaire from September 17, 2010, and the Multiple Impairment

Questionnaire from January 5, 2012, Dr. McClaran reported that Plaintiff's pain, fatigue, and

other symptoms were severe enough to "constantly" interfere with her attention and

concentration. (R. at 328.)  Although Plaintiff complained to Dr. Sardar of difficulty

concentrating on February 8,  2011, April 26, 2011, and September 1, 2011, her psychiatric exam

from each respective visit revealed that she had normal concentration. (R. at 735, 695, 759.)

Because his opinions were inconsistent with his own findings as well as those of two other

examining physicians, the ALJ could properly give less weight to Dr. McClaran's opinion under both the consistency and supportability factors.

Plaintiff argues that Dr. McClaran identified diagnostic findings from CT scans and MRIs showing post-operative changes consistent with suboccipital decompression of her Chiari Malformation.  (Pl. Br. at 13; R at 324.)  Dr. McClaran used forms and form type reports without a stated basis for his conclusions, however. When referencing the CT Scans and MRIs in the Multiple Impairment Questionnaires, Dr. McClaran failed to state the test dates and the individual results and did not adequately explain the factors that support his opinion/conclusions. (R. at 324, 767.)  Forms unaccompanied by in depth analysis are entitled to little weight. *See Johnson v. Chater*, 87 F.3d 1015, 1018 (8th Cir. 1996).  Moreover, the record did not include evidence of recent MRIs, and on August 19, 2010, Dr. Nieto explicitly stated that Plaintiff cannot have an MRI because she has an implanted electrical stimulator.  (R. at 358.)  The ALJ also considered the handwriting on the forms and questioned whether Dr. McClaran actually conducted the physical examinations, or just signed off on the forms.

The ALJ was not required to perform a factor by factor analysis because there was competing first-hand medical evidence and contrary medical opinions of other treating and examining physicians.  *See Newton*, 209 F.3d at 458.  Because his opinions were unsupported by the evidence, the ALJ was free to give Dr. McClaran's opinions little or no weight. *See id.* at 455.  The ALJ was also free to give great weight to the well-supported non-examining state physicians' opinions because he can properly accept a better supported non-examining physician's opinion over the opinion of a treating physician.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981).

22

Moreover, the ALJ was entitled to reject Dr. McClaran's conclusions that Plaintiff was disabled because a determination of disability is not a medical opinion, but rather, a legal conclusion that is reserved to the Commissioner.  20 C.F.R.§404.1527(e); *Frank v. Barnhart*, 326 F.3d 618,620 (5th Cir. 2003).  Because physicians generally define "disability" in a manner distinct from the Act, an ALJ can properly reject any conclusion of disability as determinative on the ultimate issue. *See Tamez v. Sullivan*, 888 F. 3d 334, 336, n.1 (5th Cir. 1989) (doctor's note that claimant was disabled did not mean that claimant was disabled for the purposes of the Act. There were not any laboratory tests or objective evidence to further support his findings).

The ALJ's decision to give little weight to Dr. McClaran's opinion was not erroneous and is supported by substantial evidence in the record.  Remand is therefore not required on this issue.

### D.    Plaintiff's Credibility

Plaintiff contends that the ALJ failed to properly evaluate her credibility and failed to give an adequate explanation for rejecting her subjective complaints. (Pl. Br. at 17-18.)

Credibility determinations by an ALJ are entitled to deference. *See Carrier v. Sullivan*, 944 F.2d 243,247 (5th Cir. 1991). The ALJ is in the best position to assess a claimant's credibility because he "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*, 27 F.3d 160, 164 n. 18 (5th Cir. 1994). In evaluating a claimant's subjective complaints, the ALJ must follow a two-step process. SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2,1996). First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Next, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to

determine the extent to which they limit the individual's ability to basic work activities. *Id.* If the claimant's statements concerning the intensity, persistence, or limiting effects of those symptoms are not substantiated by objective medical evidence, the ALJ must assess the credibility of the claimant's statements. *Id.*; *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

In assessing credibility, the ALJ must consider the entire record, including medical signs and laboratory findings and statements made by the claimant and his treating or examining sources concerning the alleged symptoms and their effects. SSR 96-7p, 1996 WL 374186, at *2. The ALJ must also consider a non-exclusive list of seven relevant factors in assessing the credibility of a claimant's statements: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." *Id.* at *3.  The Fifth Circuit has held that the ALJ is not required to follow "formalistic rules" in assessing credibility, and he must articulate his reasons for rejecting a claimant's subjective complaints only "when the evidence clearly favors the claimant." *Falco,* 27 F.3d at 163.

Here, at Step 5, the ALJ listed the credibility factors provided by the regulations, and cited the factors he considered in reaching his decision. (R. at 25-28.) He considered Plaintiff's allegations of pain, the amount of medication prescribed, the frequency of her doctor visits with

24

complaints, and the overt symptomatology typical of disabling pain. (*Id.*)  Ultimately, the mere existence of pain is not an automatic ground for disability, and subjective evidence of pain does not take precedence over conflicting medical evidence. *Harper v. Sullivan*, 887 F.2d 92,96 (5th Cir. 1989)(citations omitted). An individual's statements regarding pain and other symptoms alone are not conclusive evidence of a disability and must be supported by objective medical evidence of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged. 42 U.S.C. § 423(d)(5)(a).

The ALJ also considered the Plaintiff's daily activities:  cooking, washing dishes, doing laundry, driving, going shopping every two weeks, using a bank account with an ATM card, and reading a book per month. (R. at 25-26.) In addition, the ALJ emphasized his observations from the hearing as a factor relied on in reaching his conclusion regarding Plaintiff's credibility. (R. at 26.) He noted Plaintiff's responses and manner of responses to questions, her facial expressions and body dynamics, her reactions in and to the hearing proceedings, and her entrance and exit. (R. at 26.) Plaintiff was able to enter the hearing room on her own power without assistance from another individual or an assistive device. (*Id.*) Her facial expression did not exhibit any discomfort; she was able to sit down at the hearing without difficulty, and did not arise once during the 50-minute hearing. (*Id.*) Additionally, the ALJ did not note any difficulty in Plaintiff's head, arm, or hand movement. (*Id.*) She was able to answer the ALJ's questions and her representative's questions well. (*Id.*)

Although not in a formalistic fashion, the ALJ considered the factors for determining credibility, and relied on substantial evidence to support his determination.  Because substantial evidence supports his credibility finding, remand is not required on this issue.  *See Adams v.*

*Bowen*, 833 F.2d 509,512 (5th Cir. 1987).

## III.  RECOMMENDATION

Plaintiff's motion should be **DENIED**, and the Commissioner's decision should be

wholly **AFFIRMED.**

**SO ORDERED** on this 4th day of September, 2014.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

26